1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
 2                         CIVIL NO. 13-1264
   ZDENKA SIMKOVA                        :
 3                         Plaintiff,    :
   -vs-                                  :
 4                                       :
   CITY OF NEWARK; NEWARK POLICE         :
 5 DEPARTMENT; CITY OF GARFIELD;         :
   GARFIELD POLICE DEPARTMENT;           :
 6 OFFICE OF THE NEW JERSYE STATE        :
   MEDICAL EXAMINER; ETERNITY FUNERAL    :
 7 SERVICES, LLC; ZHONGXUE HUA, M.D.,    :
   Ph.D; MONICA CALDERON,                :
 8                                       :
                                         : MOTIONS
 9                         Defendants.   :
   _ _ _ _ _ _ _ _ _ _ _ _ _  _ _ _ _:
10                      Newark, New Jersey
                        March 12, 2014 10:30 a.m.
11 B E F O R E:

12         THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.

13 A p p e a r a n c e s:

14 FISHBEYN & BRISKIN, L.L.C.
   Attorneys for Plaintiff
15 17 Academy Street
   Suite 1200
16 Newark, New Jersey 07102
   BY: PETER E. BRISKIN, ESQ.
17     THOMAS E. LAMB II, ESQ.

18 JOSEPH DEFURIA, ESQ.
   Attorney for Defendant
19 524 Union Avenue
   P.O. Box 96
20 Belleville, New Jersey 07109

21
   _____

22         Pursuant to Section 753 Title 28 United States Code,
   the following transcript is certified to be an accurate
23 record as taken stenographically in the above-entitled
   proceedings.
24
                            s\ RALPH F. FLORIO
25                          Official Court Reporter


            U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101
```

2

```
 1   CITY OF NEWARK LAW DEPARTMENT
     Attorneys for Defendant
 2   920 Broad Street
     Room 316
 3   Newark, New Jersey 07102
     BY: GARY S. LIPSHUTZ, ESQ.
 4
     STATE OF NEW JERSEY
 5   DEPARTMENT OF LAW & PUBLIC SAFETY
     DIVISION OF LAW
 6   Attorneys for Defendants
     Richard J. Hughes Justice Complex
 7   25 Market Street
     P.O. Box 116
 8   Trenton, New Jersey 08625
     BY: ROBERT H. MURPHY, DAG
 9
     KENNETH HO, ESQ.
10   Attorney for Eternity

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

3

1                    I N D E X

2

3

4    WITNESSES:                          PAGES:

5    NONE                                NONE

6

7

8           E X H I B I T S

9    NUMBER          DESCRIPTION          PAGE

10   SEE ATTACHED INDEXING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Good morning.

2           All right, we're here in the matter of Zdenka

3  Simkova versus City of Newark and other institutional

4  defendants and two individual defendants.  When you're

5  putting in your appearances on the record, counsel, indicate

6  on the defense side which entities/persons you represent.

7           First from the plaintiff.

8           MR. BRISKIN:  Good morning, your Honor. Peter

9  Briskin from the law firm of Fishbeyn & Briskin, representing

10  Ms. Zdenka Simkova, and to my right is my associate Thomas

11  Lamb, also from my office.

12           THE COURT:  Okay.  Thank you.  Welcome.

13           MR. DEFURIA:  Good morning, your Honor. Joseph

14  DeFuria, from the law firm of Gaccione Pomaco,  We represent

15  the City of Garfield and the City of Garfield Police

16  Department.

17           THE COURT:  Thank you.

18           MR. DEFURIA:  Thank you.

19           MR. LIPSHUTZ:  Good morning, your Honor. Gary

20  Lipshutz, Assistant Corporation Counsel for the City of

21  Newark and its Police Department.

22           THE COURT:  Thank you.

23           MR. MURPHY:  Good morning, your Honor. Robert

24  Murphy, Deputy Attorney General on behalf of the Office of

25  the New Jersey State Medical Examiner.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

5

1          MR. HO:  Good morning, your Honor. Kenneth Ho, for
2   Sue Pasterilli (ph), we represent Eternal Funeral Services
3   LLC.
4          THE COURT:  So who represents the individual
5   defendants?  There's no proof of service on the form-- have
6   they moved?
7          MR. MURPHY:  Your Honor, I know there are two
8   former-- one former and one current medical examiner employee
9   which has not been served.
10         THE COURT:  Counsel?
11         MR. BRISKIN:  Your Honor, it is my understanding
12   that one of them was served as I understand.  I have to check
13   my office for the Affidavit of Service, on Monica Calderon.
14   The other individual defendant was unable to be served.
15         THE COURT:  So we are doing what with him?  Are we
16   entering a default-- what are we doing?
17         MR. BRISKIN:  Entering a default or dismissal-- I'm
18   sorry.  What are we doing with him?
19         THE COURT:  Are you abandoning him as a defendant?
20         MR. BRISKIN:  The other thing is that we did not
21   get any discovery as to his whereabouts from the defendant
22   state.  We just received responses yesterday.  I'm not sure
23   if we asked for his location in order to serve him.  But I
24   need to review that and I only received that yesterday.
25         THE COURT:  All right, at the end of this argument

6

1  I'll have directions for counsel so that the docket is

2  properly attended to.  Because right now we have two named

3  individuals who have no identity on the record, there's no

4  proof of services to one.  The proof of services to the other

5  hadn't been filed and there's no appearance-- as to the one

6  that has been served, etc, etc, I will let counsel know what

7  we need to do with that, okay.

8        MR. BRISKIN:  Understood.

9        THE COURT:  Okay.  All right.

10       Counsel, let's move now to the arguments.  And the

11 Court is aware of motions having been filed on behalf of the

12 institutional defendants, each moving defendant filed a brief

13 and has separate counsel.  So who wants to go first?

14       MR. DEFURIA:  Maybe since I'm in the first seat,

15 Judge.

16       THE COURT:  That's how lawyers think.  Come up to

17 the podium.

18       MR. DEFURIA:  Thank you, Judge.  Good morning, your

19 Honor.

20       THE COURT:  Good morning.

21       MR. DEFURIA:  Good morning, your Honor.  Again,

22 Joseph DeFuria, on behalf of the Garfield Police Department

23 and the City of Garfield.

24       Your Honor, we have made a motion to dismiss under

25 Federal Rule 12(b)(6), alleging that the plaintiff's

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

7

1    complaint fails to state a cause of action.  I believe for

2    purposes of this motion and in general the facts giving rise

3    to this allegation are undisputed.

4         The allegations appear to center upon an alleged

5    failure on behalf of the City of Garfield, or the Garfield

6    Police Department, in particular, to take a missing person's

7    report from the decedent's mother.

8         THE COURT:  Just factually remind me.  When saying

9    Ms. Simkova-- is it Simkova?

10        MR. BRISKIN:  Yes, Simkova.

11        THE COURT:  When Ms. Simkova went to the Garfield

12   Police Department, what date was that, how frequently was she

13   asking to file this report?

14        MR. DEFURIA:  According to the complaint, your

15   Honor, it's alleged, I believe, that she came to the Garfield

16   Police Department.  I'm going to double check the date.  I

17   want to say it's the 23rd of November.

18        THE COURT:  I think that's the date of death--

19   isn't it?  11/23?

20        MR. DEFURIA:  My understanding, Judge, that there

21   is no documentation of her visit to the City of Garfield.  So

22   we're going to have to go with the date alleged by the

23   plaintiff for purposes of today's application.  I'm sorry.

24   November 26th is the date that alleges in the complaint to

25   have come to the City of Garfield Police Department.

1           I don't believe there's any specific allegation of

2    any interaction with the City of Garfield itself.  I assume

3    the police department is for all intents and purposes within

4    the City of Garfield.  But the City of Garfield Police

5    Department is in a separate building than the City of

6    Garfield.  And I don't believe that there's any allegation

7    that she went to the City of Garfield either to the clerk or

8    somebody in the municipal office.

9           But anyway, with respect to this claim, Judge, the

10   allegation is essentially that the-- if I may paraphrase it,

11   the City of Garfield failed to train its officers or

12   employees in the proper procedure, to handle and take a

13   missing persons information.  And that that somehow was a

14   cause of a deprivation of constitutional rights.

15          In this particular case, Judge, I believe the

16   allegations are that the plaintiff was told that she had to

17   file a missing persons report in the location where the

18   decedent resided.  I don't know that to be the case, but I'm

19   going to assume that for purposes of the motion that that was

20   what she was told.  There is no specific documentation or

21   records that show that this lady came to the Garfield Police

22   Department.

23          Plaintiff then alleges in its complaint that

24   subsequent to the facts giving rise to this event, there was

25   an enactment of Patricia's law, which was an attempt to

9

1    codify or to streamline missing person matters.

2              THE COURT:  Well, let's even say that there was an

3    attempt to make existing matters better, right.

4              MR. DEFURIA:  That's fair.  Our position, your

5    Honor, in this case is that the allegation is based solely

6    upon a failure, or alleged failure to train or having in

7    place appropriate procedures to address missing person's

8    reports.  And the case law that we rely upon clearly

9    indicates that that in and of itself is potentially a

10   recognizable cause of action under Section 1983 only when

11   that failure amounts to a deliberate indifference to the

12   rights of persons with whom the police would have come into

13   contact with.

14             And I also believe that the cases indicate that

15   there has to be a direct causal link between the policy or

16   custom of the municipality and the alleged deprivation.  And,

17   your Honor, the defendants in this case submit that that

18   doesn't exist here.  The clearly-- even though the fact

19   pattern before us we have an alleged person that was coming

20   to visit his mother in Garfield doesn't show up.  Unbeknownst

21   to the mother this decedent had already been identified, or

22   at least located in the City of Newark and found dead on

23   November 23rd.  The City of Garfield had no contact

24   whatsoever with Mr. Simro.

25             THE COURT:  Well, I think, at least from my reading

```
 1  of the papers and the complaint, I think that the papers were
 2  a little more detailed; had Garfield filed a missing person
 3  there would have been at some point a linkup between the
 4  medical examiner, Newark, Garfield, and floating to the
 5  surface would have been the Simkova family.  And at some
 6  point, you know, a reunion between the decedent son and mom.
 7  And because she had hit a wall with Garfield, this essential
 8  link never was established.  And it was almost anecdotally
 9  that she learned about her boy's death some five years-- or
10  less than five years-- or four years.
11          MR. DEFURIA:  Four years and change.
12          THE COURT:  Yes, right.  So that's where I think
13  that there's this almost sine qua non or post hoc proctor hoc
14  thing.  Am I right factually, counsel?
15          MR. BRISKIN:  That's about right, your Honor.
16          THE COURT:  Yes.  Yes.  And so that's where they
17  are yoking Garfield in.  That it was an essential part, if
18  not the essential part of the chain that-- or that it through
19  the firewall down.  So how does that affect the
20  constitutional arguments that are being made here?  Because
21  we have to keep in mind, we're not talking about negligence.
22  Are we all happy with that that we're just not talking about
23  negligence?
24          MR. DEFURIA:  Absolutely, Judge.  I think that you
25  have to look at some of the other cases and see the type of
```

1   arguments that similarly made that were not deemed to be

2   sufficient.

3            I believe I cited, for example, your Honor, to the

4   matter of Gazette v. the City of Pontiac.  Which was a case

5   from 1994, 41-- it's F.3d 1061.  In that particular case, a

6   lady filed an action under Section 1983, arising out of her

7   mother's death following an abduction in a car wash.  And in

8   that case there was also an allegation that the police

9   department and the City of Pontiac failed to take a missing

10  persons report and investigate further the death, or

11  disappearance rather initially-- of the mother.  And there is

12  even some further egregious facts in that case, where not

13  only did the police department not do certain things, but

14  there was proof that the police department actually lied to

15  the family about the extent of their investigation.  The

16  contacts that they made.  The work that they had been doing

17  to help find the mother.  And the court in that case did not

18  find Section 1983 liability to attach to the City of Pontiac

19  and its police department.  And it did so, I believe, on two

20  separate analyses.

21           First of all, they talked about whether or not

22  there was any affirmative obligation or duty on behalf of the

23  municipality to do things for its citizens, and the court

24  said, absent some type of special relationship-- and they

25  pointed to things like custody or some other reason why the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  state would have control over a particular individual that--
2  absent that type of relationship there isn't a general
3  obligation or duty on behalf of the municipality to do things
4  for its residents.
5         So that was one reason why they didn't find
6  liability.  And they also addressed and talked about the same
7  type of analyses that was cited in the City of Canton v.
8  Harris case, which talked about inadequate training.  And
9  again that court basically delineated in the standard that
10  the failure to train must amount to a deliberate indifference
11  to the rights of a person with whom police come into contact.
12         THE COURT:  Well, let's for purposes of applying
13  these cases to ours, let's see if we can come to an agreement
14  on both sides about what exactly the plaintiff is alleging
15  and for how long, and what the nature is as to the police
16  conduct that would bring it within a constitutional liability
17  zone.  And I'm going to invite plaintiff's counsel to jump up
18  and say, Judge, you're wrong or you're right, because it will
19  help to just kind of have the argument.
20         Ms. Simkova goes to the Garfield Police Department
21  on the 26th and says, I would like to file a missing police
22  report-- I mean, a missing persons report about my son.  He
23  was supposed to come on Thanksgiving and he didn't show up.
24  Correct?
25         MR. BRISKIN:  That's correct.  I believe she also

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    said a couple of other things that she had tried to reach him

2    and he was unreachable.  She told them that she lived in

3    Garfield.  And also that he was coming to Garfield.

4              THE COURT:  He was going to her house and he didn't

5    show.

6              MR. DEFURIA:  May I interject.  I also believe that

7    she might have said that she already filed a missing persons

8    report with the City of New York.

9              THE COURT:  Had she already done that, counsel?

10             MR. BRISKIN:  Your Honor, the timing-- no.  I

11   believe what happened was Garfield had told her, being that

12   he did not reside in Garfield-- "where does he reside?"  He

13   resides in Queens, goes to Queens, and file the report there.

14             MR. DEFURIA:  Well, I'm only using the papers that

15   were submitted by plaintiff. In the statement of facts they

16   state, plaintiff had already filed a missing persons report

17   with the 113th Precinct in Queens, New York, on or about

18   November 22nd. Which would have been four days before she

19   came to Garfield.

20             I don't have any other facts other than what has

21   been submitted in the papers, Judge, and that's why I made

22   that statement.

23             MR. BRISKIN:  Your Honor, again, when the client

24   came to me with this issue she did not document the exact

25   days-- when it happened it happened.  She came to me about--

1  she came to me it was probably six years it was prior.  And

2  that's why we put on or about and I believe in the answers to

3  the discovery demands she committed to, you know, the date

4  being subsequent to coming to Garfield.

5          THE COURT:  Okay.  But let's not get all, you know,

6  I made a mistake, there are too many lawyers for me to

7  attempt what I'm doing.

8          Temporally, can we agree or is it impossible to

9  agree that the interaction between Ms. Simkova and the

10 Garfield police is that exchange between whomever she spoke

11 to or the passage of information, no, I'm not going to file a

12 missing persons report.  I'll even throw in going to New

13 York, because he doesn't live here.  And that pretty much

14 ends it; can I draw a box around that?

15         MR. DEFURIA:  Yes.

16         MR. BRISKIN:  Yes, I think so.

17         THE COURT:  Okay, Mr. Lipshutz.

18         MR. LIPSHUTZ:  Judge, I'm sorry, just to clear up

19 some facts.

20         In looking at the discovery responses, the New York

21 police report is reported by walk-in November 29th.  So that

22 is the day that she-- according to the New York police

23 report, that she went to New York to report the missing

24 person.

25         THE COURT:  So we can infer because of what

1   Garfield said.  The bottom line is that Garfield said it at

2   the time they interacted with her.

3           MR. DEFURIA:  Assuming we know what the date to be

4   what it is and known to be set.

5           THE COURT:  Yes. So we draw a circle around

6   Garfield's-- if we are paying actors equity rates to Garfield

7   and we were acting this out, Garfield will have one scene in

8   this drama, correct?

9           MR. BRISKIN:  That's correct.

10          MR. DEFURIA:  I would agree with that-- limited

11  lines.

12          THE COURT:  Okay.

13          And we are going to be applying the constitutional

14  tests of principles and analysis to the import of that

15  interaction as seen through the lens of Canton and Gazette

16  and all the other cases that we have.  We don't have a lot of

17  cases, which is a blissful thing for once.  But we've got a

18  fairly standard series of legal principles that we have used

19  in other cases, correct?

20          MR. DEFURIA:  I would agree with that, Judge.

21          THE COURT:  So you're saying there's no deliberate

22  indifference here.  Are you also saying that whatever

23  Garfield did it really didn't play a role in the bad stuff

24  that happened?

25          MR. DEFURIA:  I think that might be difficult for

1   me to state had no role, Judge.  But I certainly don't think

2   that it's the direct causal link between-- and that's what

3   the case law says.  That the municipal policy or custom has

4   to be the direct causal link between the alleged

5   constitutional deprivation.

6           In this case, Judge, I don't know what happened

7   with respect to the body.  Or what happened with respect to

8   someone else's obligation to identify and notify the next of

9   kin.  But Garfield had no obligation, as far as I can see;

10  they never had the body.  They never had any information

11  regarding the body.  How could they possibly have been the

12  direct causal link between whoever identified this body and

13  what eventually happened to the body?  We could go by the

14  allegations in the complaint; the body was identified at some

15  point in time, it was in the possession of City of Newark

16  Police Department, or at least somebody from the City of

17  Newark found the body and probably turned over my guess is to

18  the state medical examiner's office or some other entity.  I

19  don't believe the City of Newark takes possession of the body

20  unless it was transported for emergency treatment, which it

21  doesn't appear to have been.  And at some point there the

22  lead goes dry.  I don't know how it doesn't get to Ms.

23  Simkova.

24          But my point is, somewhere in there I think is the

25  district causal link between a policy and the deprivation.

1  Not an entity who never had possession of a body, never had

2  even any documents in its possession to even identify the

3  body.  To say, look, your resident, next of kin was found can

4  you help us locate him-- we don't have any of that.  All we

5  have is an allegation, again an allegation, now we find out

6  the date may be not right-- that she comes into the Garfield

7  Police Department.  And I don't know why our date has to be

8  right and everybody else the date is wrong. She comes in and

9  says, I want to file a missing persons report.  My son never

10  showed up and he lives in New York.  And they tell her you

11  have to go to New York or somewhere else.  And that's it.

12         I understand we're trying to draw a circle around

13  that.  To me, when you look at some of these other cases and

14  when talk about a direct causal link, this isn't it.  The

15  direct causal link, if the allegation is my client was, we

16  told you the name of this person and you dropped the ball--

17  you didn't make phone calls and do a data search and go on

18  line and try to find out who Ms. Simkova was-- then I can't

19  stand up and tell you perhaps there was not a direct causal

20  link between our policies and the failure to notify and

21  properly dispose of this body.

22         But I'm not arguing that, Judge.  I'm well-removed

23  from that.  And I think that's the first hurdle here that I

24  think I have trouble with.  It is really-- and I know your

25  Honor mentioned earlier that, you know, we had some import

1   with regard to the firewall coming down and I understand what

2   you're saying.  But I don't think that the direct causal link

3   is here.  So I stand on that argument first.  And I also

4   stand on the second argument.

5            THE COURT:  Well, could you also stand on another

6   argument which is, yup, absent our missing person's report--

7   which is the fact a lot of other-- a lot of other information

8   did not get exchanged among the entities that would have in

9   fact developed information almost effortlessly that would

10  have notified her either around the holiday time, or

11  certainly when the medical examiner identified the body and

12  buried it in a mass grave.  But acknowledging that my police

13  department's custom, policy, activity etc., is

14  constitutionally okay, because it did not have to assist,

15  change the course of what was going to happen, do anything

16  different to help her, it was doing what it does.  Can you

17  say that as well?

18            MR. DEFURIA:  Well, I think the other issue to look

19  at is, we know for a fact that the City of New York took a

20  missing persons report and that didn't change the outcome.

21  Okay.  It's not that the missing person's report would be

22  unique to New Jersey.  I believe that goes into a general

23  data base.  Because this individual was identified as living

24  in Virginia.  I believe that was the identifier.  And this

25  is, again, Judge, some of these documents were produced

1   subsequent to the filings of these motions and I don't want

2   to input--

3          THE COURT:  Well, why don't we do something about

4   that.  Because Mr. Lipshutz used a kind of an odd word given

5   the fact that this is a motion to dismiss when you referred

6   to the New York Police Report as discovery.  Normally we

7   don't talk about discovery in the context of a motion to

8   dismiss.

9          That said, in the plaintiff's opposition briefs

10  documents are attached, correct, counsel?

11         MR. BRISKIN:  That's correct, Judge.

12         THE COURT:  Right.  And I dare say arguably, had

13  you chosen to attach those documents, except for the

14  complaint obviously, but had you chosen to put the medical

15  examiner's stuff for purposes of demonstrating dates or

16  whatever else you were talking about in the complaint, I

17  don't think that the world of civil procedure would have had

18  a seizure and you would have been arrested on the spot by the

19  civil procedure police.

20         So if we have a general cache of documents that are

21  agreed upon as illustrative and might as well have been filed

22  with the complaint, I don't have any problem referring to

23  them, without the horror of turning this into a summary

24  judgment motion or anything else that would be, you know,

25  outcome determinative or put a different standard on this or

1  anything else.  The way I view this is really, you don't have

2  a legal reason to be here as opposed to anything else.  So

3  it's just the failure to state a cause of action end of

4  story.

5          And it seems to me to that extent we can use the

6  stuff that has been summoned up to develop the facts

7  necessary for that, without converting this to a summary

8  judgment motion because you will still be saying, we need

9  more stuff.  If we had more stuff, if we had enough stuff to

10  get us to the more stuff-- am I right about that, counsel?

11          MR. BRISKIN:  That's correct, Judge.

12          THE COURT:  Okay. I don't know how we fix that in

13  some legally non obnoxious way.  But I'm prepared to include

14  these documents without saying, I'm turning this into a

15  summary judgment motion, changing the way in which we're

16  making our arguments, or otherwise feeling anybody's put at a

17  disadvantage.  Because we've all been aware of it.  And I

18  think Mr. DeFuria began, we're pretty much in accord on what

19  the facts are.

20          So we'll figure out how to do that.  But I'm

21  inclined to include the information on this, to the extent

22  that I'm not doing violence to anybody.  Is that okay with

23  the plaintiffs if I do that?

24          MR. BRISKIN:  Your Honor, I think it's okay.  Just

25  as long as they're viewed in the light where there may be

1    more documents from certain defendants.

2                    THE COURT:  Understood.

3                    MR. BRISKIN:  Maybe no documents from this

4    defendant and we understand that, your Honor. But that is

5    part of our claim.

6                    THE COURT:  Right, understood.

7                    MR. BRISKIN:  And so long as doesn't affect-- and

8    it could be an apportionment of liability eventually at some

9    point, you know as long as that doesn't affect the view of

10   this case.

11                   THE COURT:  Right.  Okay.  Mr. Lipshutz, any

12   problem with that?  That way the bad word discovery doesn't

13   sound that bad.

14                   MR. LIPSHUTZ:  I don't, Judge.  I think it's

15   valuable to illuminate the issues.

16                   THE COURT:  Yes. Mr. Murphy.

17                   MR. MURPHY:  No problem, your Honor.

18                   THE COURT:  And counsel?

19                   MR. HO:  None from me, your Honor.

20                   THE COURT:  Okay.  So that's just, you know, like

21   we're trying to cleanup the docket and just kind of making

22   everybody procedurally up on these things and aware of where

23   we're at.

24                   So I think I have the argument.  I think I have the

25   factual background that we're all pretty much agreed on in my

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  head.  And we'll move to another defendant seeing what he has

2  to say.

3         MR. DEFURIA:  Thank you for your time, Judge,

4  appreciate it.

5         THE COURT:  Thank you.

6         MR. DEFURIA:  Give me a second, I brought a little

7  bit more paper up here than I wanted to.

8         THE COURT:  Okay.

9         MR. LIPSHUTZ:  Sorry, your Honor. Did you want to

10 hear the city's motion or the plaintiff's response?

11        THE COURT:  No, I rather have plaintiff talk about

12 everybody.  Again, I really think it's healthier for us to be

13 holistic about what each side is saying.  And I was thinking

14 as I was reading the briefs that you could have done an

15 omnibus brief if you wanted to. Because everybody has kind of

16 a role.  And I thought the complaint very clearly laid out

17 what the story is.  So I don't have a problem and I don't

18 think you should with it.

19        MR. BRISKIN:  I don't, your Honor, and I agree.

20        MR. LIPSHUTZ:  May it please the Court.  Thank you,

21 your Honor.

22        Mr. DeFuria stole some of the legal thunder.

23        THE COURT:  Well, you let him go first.

24        MR. LIPSHUTZ:  I let him go first.

25        THE COURT:  Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1        MR. LIPSHUTZ:  So obviously I represent the City of

2    Newark.  And while I don't necessarily agree with all of the

3    things that Mr. DeFuria has said, I'm going through my

4    presentation.

5            Obviously I know that Mr. Simkova was missing

6    November the 22nd.  And we also know that he was discovered

7    on November 23rd.  And that we now know that the Newark

8    police were called to the scene.  And we know that the

9    medical examiner came to the scene and took away his body.

10           Some of things we don't know.  And we don't have

11   all of the documents.  They're portions of the Newark

12   investigatory file that have been circulated.  But we can't

13   find the actual file.  It has been six years.  And I know a

14   search was done, but that is sort of off.  I want to just

15   give your Honor some background.

16           We know that the body was taken to the medical

17   examiner who did an autopsy and that fingerprint analysis was

18   done, because this was a John Doe body and it didn't have

19   identification.  And we know that that fingerprint

20   identification came back to Mr. Simko to an address in, I

21   believe, Virginia.  And we also know that the City of Newark

22   called out to the Virginia police to go to that location, to

23   try to locate a next of kin.

24           What we have also learned is that the plaintiff

25   went to-- let's say that she went to Garfield.  And then went

1    to the New York City Police Department to file a police

2    missing person's report.  We have at least some of that

3    report.  And that she went on November 29th.  Which is six

4    days after the discovery of Mr. Simkova's body.  And that

5    would be, by the way, the first report that would link Ms.

6    Simkova to Mr. Simko.  That would be November 29th, when she

7    filed the New York missing person's report.  Until that time

8    there's no document saying, hey, this guy is a missing

9    person.  That's important.

10            We don't know what New York City did at all.  We

11   don't know what they did.  We don't know if they inputted any

12   information into any data bases.  We don't know anything.

13   Now, I have subpoenaed-- I don't think this is getting off

14   the topic, I just wanted to give your Honor some background.

15   I've subpoenaed New York and I'm waiting to get whatever file

16   they have.  But we don't know what they did.

17            THE COURT:  Well, for us to worry our pretty little

18   heads about what we know or don't know, it appears that they

19   gotten past the date that you want to close, because we're

20   dealing with a complaint at this point that's making

21   allegations and you're talking about proofs of those

22   allegations.

23            MR. LIPSHUTZ:  I'm sorry, I would just like to

24   consider these things in the concept-- I just want to get the

25   facts out there.  I will go to my legal argument because--

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    it's important to know what we know.

2           Now, the first question here is this allegation of

3    a due process violation under the Fourteenth Amendment.  In

4    the context of a 1983 action.  So, do we have a recognized

5    property interest in a deceased body that Ms. Simkova can

6    claim?  If she's not deprived of that property interest then

7    there's been no constitutional deprivation, and then there's

8    no issue about due process.  The Third Circuit has not

9    addressed this question.  And New Jersey has a very I think

10   confusing, it recognizes what has been called a quasi

11   property interest.  Excuse me. That is a case Strachan, which

12   is in the briefs.  But the Supreme Court calls that right a

13   dubious right. A quasi right, but it's dubious, because it's

14   really not a property right.  It's really the feelings of the

15   victims-- the deceased family.  And they said it really

16   should be called a wrongful infliction of mental distress, if

17   that right has been infringed.

18          So they call it a quasi property right.  And of

19   course the due process clause, you're not allowed to take

20   life, liberty or property, without due process.  So I will

21   argue that this is not a recognized property right

22   constitutionally.  To say that police have a constitutional

23   argument to contact relatives is a unwarranted expansion of

24   the recognized due process property rights.  That would be my

25   argument.  And that is, I think, a conclusion that is really

1  was addressed by-- in the Thompson district court case--

2  Judge Pisano.

3          But let's assume for the purpose of this motion

4  that there is such a property right, then we have to get

5  into, well, is due process owed and if due process is not

6  provided what standard do we have to gauge the violation of

7  that right?  And for a substantive due process right I think

8  the standard is government action that shocks the

9  conscience.  And long ago, 20 years ago, the Supreme Court in

10 the Daniels case said that, due process is not implicated by

11 a negligent act.  You have to have recklessness:  A

12 deliberate decision to deprive someone of their property.

13 And even if you recognize, your Honor, a property right, I

14 think I can safely and clearly say that is where this case

15 really falls.  Because you do not have deliberate government

16 action in this case to deprive Ms. Simkova of any right

17 whatsoever.  You just do not have the deliberate, knowing,

18 non-negligent action.

19         The plaintiff's may argue that the City police

20 officers or-- were-- should have done this.  Should have done

21 that.  But we know, again, we know that the City tried to

22 locate Mr. Simko.  And they called in to Virginia Beach.

23 Maybe they should have done something else.  Maybe not.  But

24 that's negligence.  So when your Honor said we're not talking

25 about negligence, I didn't want to stand up. But I think the

1   allegations here only amount to negligence at best.  And that

2   would not be an affront to the due process clause under the

3   U.S. Supreme Court standard.

4           So even if the plaintiff were able to state a claim

5   that the City conducted a faulty investigation or

6   insufficient investigation, that wouldn't shock the

7   conscience.  And, again, we know that there was no missing

8   person's report that was filed when the City found the

9   deceased person.  So that's the due process aspect.

10          There are two other claims that I'm only going to

11  address momentarily.  There's the Cemetery Act count, which

12  is the New Jersey Statute 45:27.  And I think it's quite

13  clear, as Judge Pisano said in the Thompson case, that it

14  does not apply to public entities.  And I'm not going to

15  repeat the arguments in the moving papers.  It was pointed

16  out by Mr. DeFuria that there's a appellate division called

17  Lascurain v. the City of Newark, which is a case involving a

18  grave yard that was lost in time.  And they said in that

19  case, the Cemetery Act does not apply.

20          The Patricia's law, I'm not going over that.  It

21  was enacted eight months after this person was discovered.

22  So I don't know how that could--

23          THE COURT:  Well, I think that plaintiff's counsel

24  was pretty clear about how it affects it.  At least that's

25  what I drew from it.  He doesn't specifically plead a

```
 1  violation of it.  He doesn't get into the weeds about whether
 2  there is a prior cause of action created by it.  He says, I
 3  think, hey, this was remedial legislature put into effect and
 4  this is the way things should have been.  They clearly
 5  weren't.  And to the extent that there is this legislative
 6  recognition, you, Judge, can accept what we're saying which
 7  is this was bad.  And-- and we want constitutional redress--
 8  am I right about that, counsel?
 9            MR. BRISKIN:  That's correct, your Honor.  Yes.
10            THE COURT:  So when you say, I don't know why they
11  put it in, I think we all know why they put it in. It's
12  advocacy and it tends to put legs under their argument.
13            MR. LIPSHUTZ:  I know we're not here to address any
14  qualified immunity issue, which of course would be important,
15  because before you could have a Monell claim against a public
16  entity, you have to prove that there has been a
17  constitutional violation in the first place.  We're not
18  there.  But I don't, even on a qualified immunity analyses, I
19  don't see how a reasonably competent officer in November of
20  2007 should have been guided by law that was passed-- enacted
21  eight months later.  I don't think that that-- I don't see
22  how that works.  I don't know how you would get a reasonably
23  competent officer and say, and I think that's clear qualified
24  immunity, it doesn't work that way.  I know your Honor is
25  familiar with that.
```

1          THE COURT:  Yes.

2          MR. LIPSHUTZ:  And finally, there's this free

3   exercise clause claim and I don't really think it was

4   addressed in opposition to the motion very deeply.  Just not

5   allowing someone to file a missing persons report, not

6   conducting an adequate investigation.  And I think there is

7   an issue about postings in Penn Station.  That's not the kind

8   of restraints on religion that causes-- addresses-- is

9   addressed to.  It doesn't really affect her religious

10  sensibilities.  Sort of trying to pigeonhole that back.  But

11  the cases are quite clear that I set forth in the brief.  You

12  have to have governmental conduct with some motivation

13  related to her religion.  I just don't see how it's pled at

14  all.

15         THE COURT:  Well, what is pled is that she was

16  denied the right to put up posters.  That happened.  How do

17  you justify-- do you say, well, that's just another example

18  of they could have done things differently.  They could have

19  done more.  They could have done less.  This is something

20  they did do that doesn't look good.  But even accepting that

21  they did it and that it bespeaks an attitude about how far

22  they were going to go in terms of backing up a private

23  investigation, it still doesn't rise to the level of what

24  they had to do.  Or a level of Constitutional inaction or

25  action that comes under a 1983 successfully pleaded case.

1          MR. LIPSHUTZ:  Well, I agree with you.  But I just

2    don't even see it being a religious exercise here.  I don't

3    see any action by the city.

4          THE COURT:  Take out the religious exercise, let's

5    say I go your way and the Third Circuit is looking at it and

6    they go, yeah, well, that was kind of-- they make a mistake

7    about whether he's alive, or telling her that he's alive.

8    They actually at the same time are investigating his death

9    down in Virginia Beach.  They released the body.  They know

10   that there is somebody wandering around wanting to put up

11   fliers about her son.  Hey--

12         MR. LIPSHUTZ:  It's not clear-- it's not clear that

13   there's a connection between Ms. Simkova, who is trying to

14   put up fliers about her son and.  I don't see that connection

15   here.  I just don't.  Because you've got to remember--

16         THE COURT:  Well, remember it's not just your

17   sensibility, it's whether or not a reasonable inference can

18   be drawn.

19         MR. LIPSHUTZ:  I understand that.  But she says

20   that she came on December 30th, the day after she filed a

21   missing persons report in New York.  It's not clear at all

22   what New York has done.  It's not clear at all.  To say, what

23   is New York done-- no one knows.  I mean, I don't know how

24   you tie-- not you, your Honor.  There's no tie between coming

25   on the 30th and saying, we want to file a missing persons

1  report, but you're already filed one in New York there where

2  he lives and that's the entity.  You don't have two entities

3  doing missing persons, your Honor, you have one.  Otherwise

4  you have two investigations-- don't work that way.  You make

5  a report and that entity is responsible for the

6  investigation.  It's not like you file one in every town.

7  You have one.  So New York is doing the investigation, Newark

8  is not.

9         So I just don't see the tie between posters and a

10 constitutional deprivation under the free exercise of religion

11 clause.  I don't know if there's another constitutional claim

12 with respect to posters that are not-- you're not allowed to

13 put up.  But I don't see that is a free exercise and that's

14 what's pled in this complaint.

15        So some miscellaneous items.  There was no tort

16 claim notice filed, which I think is acknowledged.  So it's

17 never been filed.  So to the extent--

18        THE COURT:  When would it have been timely given

19 the evolution of events?  Would it have had to have been

20 within the prescribed time after the New York police officer

21 informed her and she confirmed that, in fact, her boy had

22 been buried?

23        MR. LIPSHUTZ:  I would agree that the discovery

24 rule would tolled until that time, at which time she would

25 have-- let's be generous and say, it's the time that she

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   learned that her son was wrongfully buried let's say.

2           THE COURT:  Okay.

3           MR. LIPSHUTZ:  Then I'm trying to be generous.  She

4   would have 90 days statutorily to file a claim.  We're up to

5   one year to show exceptional or extraordinary circumstances.

6   But in any event, you just can't file a complaint.  That's

7   not a notice of claim.  That is not-- that doesn't comply

8   with the statute.  So she would have had up to a year to file

9   that motion, but she didn't and she filed a complaint.  And

10  it's been well over a year.  And according to the Tort Claims

11  Act, state court judges don't have authority to extend that

12  period after one year that that's the cutoff.

13          THE COURT:  Now, does that mean that she's pretty

14  much foreclosed from getting any redress for negligent

15  actions by anybody?

16          MR. LIPSHUTZ:  A tricky question.  State law

17  claims--

18          THE COURT:  I asked it.

19          MR. LIPSHUTZ:  I argued earlier that the best she

20  could show is negligence with respect to the City of Newark--

21  with respect to the investigation.  And I argued that

22  negligence is not sufficient for a due process violation.  So

23  tricky question.  For a state law claim, she's precluded

24  under any theory of conduct, negligence, wilful misconduct--

25  anything-- she's precluded.  It's just done.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          Finally, I put in the motion to dismiss the count--
2   the aspect of punitive damages dismissed upon a public
3   entity.  I'm not revisiting that.  That's pretty much
4   standard, no punitives against public entities.
5          THE COURT:  Let me just probe a little bit
6   further.  Are you saying that to the extent that we have Ms.
7   Simkova cornered by a rejection of any constitutional
8   wrongdoing by anybody in the world with respect to this, or
9   any of the named defendants; you're saying that somewhere
10  there's a lingering whiff of negligence that could be flogged
11  into life in federal but not in state court because of the
12  Tort Claims Act?
13         MR. LIPSHUTZ:  Well, I think it would be denied in
14  federal court because of the Tort Claims Act.  I'm sorry.
15         Assume for a minute, your Honor, that your Honor
16  dismissed the constitutional claims.  And you said, you know
17  what, I don't want to deal with the state law claims-- I'll
18  remand it back to the state.
19         THE COURT:  That's right.
20         MR. LIPSHUTZ:  They had a process in state court.
21  They have a process, a remedy in state court that they could
22  have asserted, within the statutory Tort Claims Act period.
23         The fact that that remedy is no longer available to
24  them because of their failure to file a tort claim notice,
25  it's irrelevant, but they had a remedy that through no fault

1  of the City of Newark or Garfield or the medical examiner,

2  that's gone, but they had that remedy.

3          I think may be that-- does that answer your Honor's

4  question?

5          THE COURT:  Yes, it does.

6          MR. LIPSHUTZ:  So even if you wanted to consider

7  that as a part of the due process that they would have been

8  entitled to, to remedy this property interest, they had that

9  remedy.  But-- it's like if they didn't file it within two

10  years let's just say, right.  Statute of limitations.  They

11  had a remedy but didn't file it.

12          THE COURT:  Okay.

13          MR. LIPSHUTZ:  Does, your Honor, have any other

14  questions that I could address?

15          THE COURT:  Not right now, but if I think of

16  anything tricky I will bring you back up.

17          MR. LIPSHUTZ:  Thank you, your Honor.

18          THE COURT:  Mr. Murphy.  Now, one of the arguments

19  made in the opposition is that your entity is not entitled to

20  immunity that you claim.  And there weren't any reply briefs

21  filed and so I was curious how you respond.

22          MR. MURPHY:  I'm sorry, your Honor, but there was a

23  reply brief filed.

24          THE COURT:  There was-- I apologize-- I didn't see

25  it.  Okay.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          MR. MURPHY:  There was, and we attached a

2  certification from the Medical Examiner's office as well.

3          THE COURT:  Okay, tell me about that.

4          MR. MURPHY:  So that our moving papers relied on

5  the fact that the state, I'm sorry, I always get this wrong.

6  The Office of New Jersey State Medical Examiner is an entity

7  which is created within the Division of Criminal Justice

8  within the Department of Law, under the auspice of the Office

9  of the Attorney General, which is under the Executive Branch

10 of the State of New Jersey.

11         Counsel raised the argument that because these

12 counties, Essex and I don't remember the others that were

13 involved, have elected not to have their own county medical

14 examiners and their medical examiner's services therefore

15 provided by the Office of the New Jersey State Medical

16 Examiner, that it was really more of a Monell claim that was

17 really a claim against the counties.

18         In response we provided a certification, which we

19 believe satisfies the factors, which says that the employees

20 are employed in the northern medical examiner's office are

21 state employees.  They are a mutual medical examiner. If you

22 look at the statute which allows the medical examiner to take

23 over when counties decide not to have a medical examiner, it

24 says that the state medical examiner shall designate one of

25 his assistants to perform the duties of the office.  It

1    further allows that that assistant may appoint employees or

2    personnel to aid investigators as they deem necessary.  They

3    are all state employees and they're all serving under the

4    Office of the Medical Examiner.  And any claims which would

5    be paid for that report would be paid from the state tort

6    claims fund.  Would not be reimbursed by the counties.  The

7    counties do pay for the services provided-- there is some

8    kind of an arrangement-- it's like a per body process fee

9    that the counties do pay the medical examiner to do those

10   duties.  But it is still the state acting state employees.

11          THE COURT:  This is yet another, we should go on

12   the Steve Kornacki show on a Saturday and Sunday morning,

13   that get up and talk about the vagaries of the New Jersey

14   government.  There is more government per square inch than

15   any place on the planet.  This is another example of it,

16   right?

17          MR. MURPHY:  That's correct, your Honor.

18          THE COURT:  Okay.  The argument then is that you

19   just can't be sued, is that correct?

20          MR. MURPHY:  Yes, the Eleventh Amendment.

21          THE COURT:  Right.  Now, to the extent then that

22   the medical examiner and his employee that began this

23   discussion with everybody about haven't really been

24   individualized for purposes of service or motion practice,

25   I'm assuming this same argument that you're making would

1  cover them; is that correct?

2          MR. MURPHY:  It would cover them in their official

3  capacities.  If they were served, it would also be making a

4  qualified immunity argument on their behalf, there is

5  parenthetically evidence that office posted an ad in the Star

6  Ledger for three days, advertising that Michael Simkova's

7  body was at the Northern Regional's office and asking for

8  information regarding next of kin.  They also sent a letter

9  to the Newark PD, as turns out I think about six weeks before

10  the body was released saying, we're planning on releasing

11  this body, let us know if we need more time.

12          So we think that that would meet the constitutional

13  requirements.

14          THE COURT:  All right.  Thank you very much.

15  Counsel.

16          MR. BRISKIN:  Thank you, your Honor.

17          THE COURT:  And you can address your adversary's

18  arguments is whatever order that pleases you.

19          MR. BRISKIN:  Thank you, your Honor.  First I'll go

20  with the state since it's the last and kind of little

21  limited.

22          THE COURT:  Yes.

23          MR. BRISKIN:  I think there are really two

24  arguments here.  It's not just the Eleventh Amendment.

25  There's a statute that was in effect at the time of the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    events in this case, which is the New Jersey Cemetery Act.

2    And that is Cemetery Act expressly provides for damages,

3    okay, for violation of that act.  And the violation lies in

4    the authorization to bury a body.  And there's a hierarchy

5    outlined as to who has the right to make that decision.  How

6    that body to be buried.  Where that body is to be buried.

7    And that hierarchy starts out with next of kin.  In this case

8    we know for a fact that it wasn't the next of kin that buried

9    the body.

10           Now, who can be held liable for damages-- any

11   person.  Now, a person is also defined in that statute.  And

12   a person is quite literally defined as, other than

13   individual, corporation, partnership, association, or any

14   other public or private entity.  That statute also-- the

15   Cemetery Act doesn't have any notice requirement.

16           So that's kind of a my first claim against the

17   state.  As to why the regional Medical Examiner's Office as a

18   public entity, whether it is northern regional examiner or

19   the state medical examiner's office may be held liable in

20   this case.  For their, you know, because they're the ones

21   and, again, if we're going to talk about some of the

22   evidence-- are the ones that released the body for burial to

23   a contracted private company, Eternity Funeral, who is not

24   making a motion to dismiss here.  Which ultimately led the

25   body to be placed into the ground in a box.

1           The second argument is, is the exception to the

2    Eleventh Amendment of sovereign immunity.  And the test,

3    okay, is where the issue arises.  And the test is really, we

4    believe this is that a northern regional examiner's officer

5    acting as a non municipal corporation.  And there are two of

6    these regional medical examiner's offices in the State of New

7    Jersey.

8           THE COURT:  Well, what do you do with the

9    certifications that you got?

10          MR. BRISKIN:  Well, I don't think should be

11   considered because it's submitted in a reply. It's a

12   self-serving certification.  Making conclusory statements as

13   to the source of funds.  I mean, we can understand, yes maybe

14   the check for damage may be paid by the state.  But the state

15   could say, hey, you four counties Hudson, Essex, Somerset and

16   Passaic, who are responsible by statute all costs

17   unqualified.  For the budget for next year you have to put in

18   another X amount of dollars to cover the liability because

19   that's one of the costs.  Because the situation hasn't arisen

20   yet doesn't mean that the state is not going to say, hey,

21   this, you know, a cost of any business is liability.  And if

22   you're going to budget for the next year and somebody else is

23   paying you for that you have to collect money for that, you

24   have to collect that cost of liability.

25          THE COURT:  Well, let's jump all over that for the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   moment.  And let's get beyond the time and wrangling about

2   whether or not that applies and jump into exactly what you're

3   saying the ME did wrong.  Okay.  What-- because trying to

4   pierce the veil of all of this immunity stuff and getting to

5   the facts may be unnecessary, if, in fact, immunity is

6   applied.  But I'm curious as to what Ms. Simkova says the ME

7   was supposed to do right.  And that kind of allows you to

8   talk about your Cemetery Act issue.  You're saying that they

9   took away her rights to the person to whom the person was to

10  be released, correct?

11          MR. BRISKIN:  I didn't understand the ME?

12          THE COURT:  Yes.  I mean, to the extent that you're

13  saying the Cemetery Act applies, to the extent that you're

14  saying bad things were done by Mr. Murphy's client-- what?

15  What did they do?  What should they have done?

16          MR. BRISKIN:  Well, the facts that we have here is

17  that there is Mr. Uricolli or Det. Uricolli who it appears is

18  employed by the Medical Examiner's Office.  And he did some

19  sort of investigation, and as a matter of fact what I got

20  yesterday which I perused, revealed that he spoke to the

21  owner of the funeral home where Mr. Simko was found and he

22  got some information from them.  He was told that, oh, we

23  know this face.  He's been here-- I think it was two times a

24  week and, you know, for whatever he was doing.  Okay.  Other

25  than that they had the body.  They took from my understanding

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   the evidence.  And the evidence is not-- it's not that he was

2   just found without ID.  He was found with two cellphones on

3   him.  I could get into a lot of things where, you know, to

4   oppose Mr. Lipshutz's argument that all he sees is

5   negligence.  Because I think anybody with a little bit of

6   knowledge about the internet and how to use a cellphone could

7   have done a lot more and discovered family that lived 14

8   miles away.  But that's getting a little bit off topic.

9          So being they had somebody that was involved in

10   some sort of investigation, there seems to be a disconnect

11   here, between all of these public entities which are here to

12   serve the citizens.  You know, who is supposed to do the

13   investigation in this event?  And that's, you know, part of

14   why we cited to Patricia's law.  Because I don't think that

15   the Medical Examiner's Office needed to do and what they had

16   to rely upon and what Newark PD knew. And I don't know if

17   Newark PD didn't know or didn't care.

18          So I think that's why the Medical Examiner's Office

19   is involved.  And, yes, we have these facts that it went to

20   the Newark PD, hey, have you done anything?  We have eight

21   months of the body laying here.  Eight months.  You're not

22   talking about two weeks or one week or eight weeks it's eight

23   months.  And-- and, you know, that Det. Uricolli, I don't

24   know if there is anything else on any of other individuals or

25   any other facts that would put more-- allow more credence to

1   the fact that the Medical Examiner's Office was involved in

2   the investigation itself.

3          So that's why I think they should remain in this

4   case at this point.

5          THE COURT:  Okay.  Thank you.  Moving on to the

6   other points.

7          MR. BRISKIN:  Okay.  Garfield next.  To follow

8   along the analogy.  We're looking at this through a lens.

9   And this is a movie and we have scenes and actors and theme.

10  One scene, one actor in a movie can play a pivotal role,

11  okay. And I think your Honor phrased it, hit the nail on the

12  head that had they taken the report.  And that's the

13  allegation that they failed to take the report.  They said,

14  hey, we're not doing this, he's from New York, go to New

15  York, let them deal with it.  I don't want to deal with it.

16  So you live here, okay, that's fine.  He was missing at that

17  point, you know, for several days.  They were notified that

18  she was there.  He was coming to visit her in Garfield.  And

19  they chose not to take the report.  We don't know what New

20  York did and that's not an issue in this case.

21         But, had they taken the report, the allegations

22  that that report should have been entered into, I believe

23  there are two national data bases here for missing persons.

24  Had they taken the report and had Newark done the right thing

25  or the Medical Examiner's Office it would have triggered a

1    match.  Okay.  So that's where, you know, you would be

2    getting the-- the fault lies.  Not taking the report.  And we

3    don't know if they had a policy, or if they didn't have a

4    policy, if they were trained or if they were not trained.

5    The allegation that she came and she spoke to an officer,

6    yes, it was one event, one conversation.  But they had the

7    choice, okay.  Or maybe they didn't have the choice.  I don't

8    know what it was.  But without further discovery we'll never

9    know.  And whether or not they contributed to-- or whether or

10   not that's a deliberate indifference.

11           THE COURT:  Why isn't New York sued then because

12   they did file a police report, I mean a missing persons

13   report and they-- didn't they have the same obligation with

14   the report that this was filed with them?

15           MR. BRISKIN:  Well, the communications to my client

16   to New York were frequent and regular.  Did not give her any

17   indication that they dropped the ball anywhere.  If we still

18   have time to join them in this action, which I believe we do,

19   if discovery reveals or indicates, hey, we need to get them

20   in as well.  Because our argument, and we repeat this theme,

21   is that setting the wheels in motion, you know.  This was not

22   a one act.  I think we have multiple culpable parties here.

23   And their actions in total is what caused and was a

24   deliberate indifference to her rights.  I think--

25           THE COURT:  Well, culpable how though?  Culpable

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    constitutionally or culpable in terms of negligence?

2            MR. BRISKIN:  I think culpable constitutionally,

3    your Honor. I think that the argument there that she doesn't

4    a property right is, I don't see any basis for it.  There's

5    80 years of law in the State of New Jersey saying that

6    there's a property right in the body of the deceased by the

7    next of kin.

8            Now, and as a matter of fact that law has been

9    honed down-- has been honed down to where we get to

10   Lascurain.  And Lascurain had to do with improper maintenance

11   of a burial site.  Miss Lascurain, I believe it was her

12   father who was, you know, originally he may have been

13   estranged, she didn't really have any connection with him,

14   and who is also buried in a Potter's field.  And what they

15   did was that they narrowed the law down and said, you do have

16   a property right, but it doesn't extend passed the point of

17   burial.  The property right is in the body of the deceased

18   and exists from the time of death until the time of burial

19   and in this case it was eight months.  Okay.

20           So the argument is that it was Ms. Simkova's

21   property right.  She was deprived of her right to bury him

22   for eight months.  Yes, that property right cuts off once he

23   was put in the ground. But for eight months three players at

24   minimum that were involved in that deprivation.  And if we go

25   to-- some of the cases I think are a little, you know,

1   they're not applicable here.  If you look at Gazette, and if

2   you look at DeShaney, which are cases cited over and over by

3   all counsel.  And I think-- well, what happened there was a

4   third party actor, okay, who deprived the due process right.

5   Meaning either the life or liberty.  DeShaney, the child was

6   returned to the father, who ultimately beat him until he

7   became, you know, mentally incapacitated.

8           In Gazette, you're talking about a third person, an

9   individual who took this woman, you know, I believe sexually

10  abused and put her in a trunk of a car and then she ended up

11  dying.  Egregiousness, I don't think as egregious here in the

12  police conduct in lying about an investigation.  Here the

13  body, the right, the property right was in the possession of

14  a public entity.  And that's the medical Examiner's Office.

15  They had-- if you want to say custody, possession, physical

16  possession, they had physical possession.  And the Newark PD

17  had possession over the investigation.  And they have the

18  most-- I mean if we look at the records, and right now the

19  file is missing or whatever it is. They had the most

20  investigation.  I think they have 5 or 6, 7 officers involved

21  here-- detectives.  All of which in my opinion did nothing.

22  It wasn't negligence.  This was a deliberate indifference to

23  her rights.  Because as we know police have resources.  And

24  my belief honestly is that resources were not all allocated

25  to this, whether it be in training, education, custom,

1  policy, because this doesn't help-- or this doesn't make

2  reductions in crime.  This doesn't make statistics.

3        THE COURT:  Well someone-- one of the moving briefs

4  there are two references.

5        In the brief filed by the City of Newark, on page

6  18, the argument is made in the last full paragraph. "The

7  real problem alleged by the plaintiff is not that the City

8  interfered with the rights as a parent to bury her son,

9  rather it is that the City did not assist her."

10        And in the brief filed on behalf of the City of

11  Garfield and the Garfield Police Department on page 10, the

12  statement "the free exercise clause only limits the

13  government's active interference with the free exercise of

14  religion and does not require that government's active

15  protection of an individual's religious rights."

16        Both statements, albeit in different contexts,

17  appear to be saying that there is a line that the law

18  recognizes.  And on one side of that line is active and

19  deliberate interference with the known rights.  And on the

20  other side of that line is a nonstarter i.e. whether you want

21  to call it negligence or a neutrality, or a limp-wristed

22  response, or even a confused or mistaken response, but not

23  actionable.  And I believe all of the defendants are lining

24  up on that side of the line.  And so I really need from you

25  where they-- if you agree with that.  Where they actively

47

 1   interfered with, you know, in a manner that would cross the
 2   constitutionally appropriate line, because it was deliberate
 3   indifference to a known constitutional right, or it was a
 4   state actor doing something to an individual liberty that
 5   calls into play due process.
 6        MR. BRISKIN:  Well, I think, your Honor, the fact
 7   that he was in their possession, okay, is the active
 8   interference.  If they didn't find him and if all we are here
 9   for was that they didn't take a report from her and, you
10   know, he wasn't in their possession for eight months and
11   actively investigated.  The report even says active pending.
12   I never saw a closed report in that investigation.  I think
13   that is the active.  That's the action.  And the action-- and
14   the argument against Garfield, they didn't have this body,
15   you know, they weren't part and parcel of picking him up-- we
16   all know Newark doesn't store bodies in their police
17   departments.  It has to go to a Medical Examiner's Office and
18   the morgue.  But Garfield, you know, they were also a
19   parallel police department.  They worked together throughout
20   the state.  They had the body.
21        So I think it's a little easier to find the
22   activity between Newark, and the Medical Examiner's may be a
23   little bit more difficult to charge with.  But I'm going to be
24   arguing that in the same vein they were active in their
25   involvement because the body was in possession of a parallel

1   police department.  And the investigation of the body was in

2   a parallel police department, the body was in the State

3   Medical Examiner's Office.

4           THE COURT:  Okay.

5           MR. BRISKIN:  A couple of other things that I

6   wanted to point out, your Honor.

7           Mr. Lipshutz had talked about the case of Canton.

8           THE COURT:  Yes.

9           MR. BRISKIN:  That case was actually remanded for a

10  hearing, on a factual issue on whether or not the conduct

11  arose to deliberate indifference.  And that was where the

12  woman was taken into custody and fell down twice in the

13  police station, they said, hey, let her go.  They didn't do

14  anything.  Then it turns out that the authority had a

15  decision for medical treatment vested in the police when the

16  person is in their custody.  And does have an act or a

17  non-act.  They let her out.  And then her family took her in

18  an ambulance and got her to a hospital and she suffered--

19          THE COURT:  Wait, but aren't we back now to the

20  failure to train issue?

21          MR. BRISKIN:  Right.  And they had to address

22  whether or not it was an action or not.

23          THE COURT:  Well, let me ask you something.  Is

24  every case and law is made, and I'm not talking about making

25  law.  But laws are interpreted on individual fact scenarios.

1   And if you were sitting next to somebody outside a gate of

2   103 in Newark airport and just decided to chat up what you

3   did for a living and without giving names you told somebody

4   sitting next to you about the facts of this particular case,

5   no doubt somebody would be horrified and say, wow, that's

6   horrible.  And that's worse than my sitting for the rest of

7   the plane ride and kind of pestering you and saying, well,

8   who is the bad guy here? And you might say, you know what,

9   everybody is a bad guy.  If you think about it-- this is one

10  of these real perfect storms of bad guys.

11          Now, are we saying that everybody's individual,

12  whether it's inaction, mistake, poor procedure that was

13  tightened up with the passage of Patricia's law-- whatever.

14  When something goes this afoul are you saying that the

15  Constitution should give someone a remedy because you can't

16  dispose of our own next of kin, we can't do our own

17  investigations.  And, therefore, there's a collective

18  responsibility that kind of overrides all of these precious

19  arguments that your adversaries are making?

20          MR. BRISKIN:  Well--

21          THE COURT:  Is that what you want to argue to me?

22          MR. BRISKIN:  Yes. I believe that's correct, your

23  Honor.  And, you know, I think the statute also applies to

24  all of the defendants.  I think they all played a role.  But,

25  yes, I do believe that, you know, the Constitution should

1  provide a remedy for that because we have the property

2  interest, okay.  And she was deprived of her right.  You

3  know, she-- and that's where, you know, the religion ties in

4  you know.

5          That violation was not really a not being allowed

6  to place posters.  It was her religious believes, you know,

7  by burying him and as we learned today there was no type of a

8  religious burial.  We know that now after the deposition of

9  Mr. Booker who is, you know, owner of Eternity Funeral

10  Services.  You know, death and birth, you know, in life as

11  far as we know is quite important as far as religion goes.

12  There are certain rituals within the religions.  And

13  certain--

14          THE COURT:  Well, isn't that part of the fallout of

15  this?  Isn't the amount of time that things started to go

16  wrong fairly short?  And couldn't there have been points at

17  which this thing didn't have to go as wrong?  I think we can

18  agree.  But the issue is, is every bad outcome have with it

19  under our system of justice the consolation price of a

20  lawsuit.  Does every failure find the murderer entitled a

21  victim's family to sue because the police didn't do the job

22  that they could have done?  I mean, that's where, you know,

23  in the long run we're all kind of wrestling with what does

24  the law do for us under our Constitution.  Under the Tort

25  Claims Act, Mr. Lipshutz said, you might have a much easier

1   go.  Because you could point to a number of places and people

2   who could have done more and make the argument that they

3   should have done more and maybe get a jury to agree with

4   you.  But we're talking now about our Constitution, and the

5   enormously elastic, but still structured, rights we have

6   under the title of due process.

7          And I ask you that because when you were fashioning

8   this complaint, and it's a nice lucid complaint, you give the

9   reader what he or she needs to understand what happened.  You

10  had to be hitting the books and really searching your legal

11  knowledge for theories, theories of why she deserves redress,

12  right?

13         MR. BRISKIN:  That's correct, your Honor.  And I

14  think that example that you brought up is a person whose, you

15  know, child's been killed and the killer has not been found

16  and have a cause of action and should the Constitution

17  provide them with a consolation prize so to say?

18         THE COURT:  Yes.

19         MR. BRISKIN:  I haven't researched that issue.  But

20  what I do know here is that there is a property interest.

21  Before you can even get to the question of whether or not

22  they look at the conduct of the police, should they have done

23  more of an investigation, less, or a different

24  investigation.  First you have to have the property

25  interests.  And I think it's clear in this case that when she

1  was deprived of her right to his body and to direct his

2  funeral and bury him where she could bury him, where she

3  could about visit him in the religious manner consistent with

4  their beliefs-- was she deprived of that, yes.  I think there

5  is absolutely grounds for remedy under the Constitution.

6            THE COURT:  Okay.  Fair enough.  Fair enough.

7            MR. BRISKIN:  Thank you.

8            THE COURT:  Anything from the movants?

9            MR. DEFURIA:  I have two quick statements and then

10  I'm finished very little.

11            MR. LIPSHUTZ:  And myself very little.

12            THE COURT:  I thought you will stand up and say

13  nothing.

14            MR. LIPSHUTZ:  Yes.

15            MR. DEFURIA:  Judge, two things said by Mr.

16  Briskin.  First of all, it is the first time that I ever

17  heard anyone argue that the City of Garfield, Garfield Police

18  Department somehow is a parallel unit or a parallel

19  department to anybody else in this case.  And that the City

20  of Newark Police Department's custodial possession of the

21  body is somehow giving possession to Garfield.  We didn't

22  even know who the person was.  We had no information.  We

23  didn't get a fax or a letter from any other entity saying, we

24  found Mr. Simko, can you help us, we don't have anything.

25            So to the extent that we would anyhow share in any

1  liability potentially for having possession of a body by

2  another police department I don't believe there is any

3  support for that.

4          I think this is really a negligence case, Judge.  I

5  think the more we talk about it the more we all-- what should

6  have been done or should not have been done, the more the

7  trial lawyer in me keeps feeling about a negligence case.

8  And that's what I keep feeling.  And I want to point to page

9  3 of my reply brief, Judge.  Where I block cite to the

10 language in the City of Canton case.

11         And in that case the Supreme Court of the United

12 States addressed the high standard of fault and causation

13 that they were enunciating when they were describing the

14 deliberate indifference standard, so as to not open

15 municipality to unprecedented liability under Section 1983.

16 There the court said, to adopt a lesser standard of fault in

17 causation would open municipalities to unprecedented

18 liability under Section 1983.  In virtually every instance

19 where a person has had his or her constitutional rights

20 violated by a city employee, a 1983 plaintiff would be able

21 to point to something the city could have done to prevent the

22 unfortunate incident.  Thus, permitting cases against cities

23 for their failure to train employees to go forth under 1983

24 on a lesser standard of fault would result in de facto

25 respondeat superiority liability on municipality, a result we

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  already rejected in the Monell case.  It would also engage

2  the federal courts in an endless exercise of second guessing

3  municipal employee training programs.  This is an exercise

4  that we believe that federal courts are ill-suited to

5  undertake and as one that implicates serious question of

6  federal case.

7           The reason I read that aloud, Judge, is exactly

8  what we're doing.  We're trying to say, okay, what did

9  everybody do wrong or what could they have done better?

10 That's not what we should be looking at and that's not what

11 the Canton court wanted it to happen when it said, no, we

12 need deliberate indifference, not negligence, not

13 recklessness, not willful conduct-- deliberate indifference.

14 And I don't believe that's here, Judge.

15          MR. BRISKIN:  May I just respond to that, Judge?

16          THE COURT:  Sure.

17          MR. BRISKIN:  Your Honor, I don't disagree with

18 that position as far as the standard is concerned.  I think

19 that the court says, hey, you're right, it's not negligence.

20 Okay.  And there's a question of fact here, you know, the

21 level-- okay of conduct is a question of fact.  We're not

22 here for summary judgment motion.  We're here for a 12(b)(6)

23 motion to dismiss.  Have I, as my client alleged, the

24 necessary facts to go forward in this case.  I think we

25 have.  I think that it's necessary to explore the procedures,

1   their policies, their training and their customs, to

2   ascertain and be able to put forth a case.  Okay.  And let,

3   you know, a jury decide whether or not their actions or

4   inactions, or whatever they had going on rose to the level of

5   deliberate indifference.  And that's exactly what the end

6   result of Canton was.  It was remanded for that purpose.

7          THE COURT:  And they being Garfield and Newark and

8   the ME's office?

9          MR. BRISKIN:  At this juncture, I think if that's

10  how this motion will be decided, I think without a doubt it

11  has to go forward.

12         THE COURT:  Fair enough.  Let's see, Mr. Lipshutz,

13  you have one last point to make.

14         MR. LIPSHUTZ:  0h, a couple, your Honor,

15  respectfully.

16         THE COURT:  Or 17 long--

17         MR. LIPSHUTZ:  Your Honor, I really didn't talk

18  about deliberate indifference-- Mr. DeFuria did.  But it

19  struck me when I was listening to the argument, who is being

20  deliberately indifferent to Ms. Simkova?  The City of Newark

21  is investigating a John Doe.  They don't know of her and her

22  existence until after seven days.  And-- and it's unclear how

23  they connect it.

24         When you talk about deliberate indifference, what

25  they really are saying is, what they're really saying, your

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1 Honor is in every missing persons case, where the police

2 department does a crappy job of investigating, a negligent

3 job of investigating for a missing person, a John Doe,

4 identify, in every case you owe a duty under the Constitution

5 to contact the family.  And if you don't do it you've

6 committed a constitutional deprivation.

7        THE COURT:  By contact the family you mean find who

8 the person is--

9        MR. LIPSHUTZ:  Right.  If you do a lousy job of

10 investigating in missing persons, in every John Doe that is

11 discovered you will be probed into your investigation in a

12 Constitutional sense, I don't think that that's what due

13 process means.

14        In the U.S. Supreme Court case and this is what

15 struck me.  Daniels versus Williams from 1986.  I'm sure your

16 Honor is familiar with it.  A prison gentleman fell on a

17 pillow, okay, that was negligently left there.  He didn't

18 have a state law remedy, because the state had immunities--

19 sounds familiar.  He sued for due process.  And the Supreme

20 Court said, to hold the injury caused by such negligent

21 conduct is a deprivation within the meaning of the Fourteenth

22 Amendment, would trivialize the century-old principle of due

23 process law.  Negligent conduct, a crappy investigation, a

24 lousy investigation, is not deliberate indifference-- it's

25 negligence.  This is a negligence case.  That's all I have.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          THE COURT:  Thank you.

2          MR. BRISKIN:  Your Honor, may I respond?

3          THE COURT:  Sure.

4          MR. BRISKIN:  I think what Mr. Lipshutz was trying

5    to allude to was a floodgates argument, slippery slope

6    arguments.  We're not alleging that every person would have a

7    cause of action.  I didn't take this case because I evaluated

8    every person.  I evaluated the facts of this case.  And our

9    position is that whatever they did, okay, I don't know,

10   pursuant to it as an education training or a procedure, but

11   it was worse than lousy.  Okay.  I think a high school

12   student with basic knowledge of the internet could have found

13   the parents; on a simple public record search was able to tie

14   the parents to him.

15          The only investigation that they did as far as we

16   know now since we're going into the facts, is to take the

17   fingerprints and match it to an arrest once in Virginia.  And

18   as a matter of fact his father with the same exact name lives

19   in Virginia too-- so they stopped right there.

20          Your Honor, we need to get to the point of whether

21   or not this is negligence or deliberate indifference, and I

22   don't think we are there yet.  And I think discovery as I

23   said previously has to be conducted.  And at that point, if

24   they feel the same way that they do, in light of all of the

25   facts they can make a different type of a motion, in which,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  you know, is there enough to let this go to a jury to decide

2  whether or not this is deliberate indifference or if it's

3  pure negligence.

4          I think that's all I have for your Honor.

5          THE COURT:  Okay.  The record should reflect that

6  this was a very good argument and that the briefs submitted

7  to the Court were well-reasoned and grammatical and cogent,

8  and I thank counsel for putting the Court to the task of

9  trying to apply these Constitutional principles to this

10  particular fact pattern.

11          I'm going to be writing a written decision.  We

12  will try to get it out to you by the end of the month, so

13  thank you very much, counsel.

14          MR. BRISKIN:  Thank you.

15          MR. LIPSHUTZ:  Thank you.

16          MR. DEFURIA:  Thank you.

17          MR. MURPHY:  Thank you, your Honor.

18          THE COURT:  Thank you.

19

20

21

22

23

24

25